See also 450 F.Supp. 323.

**UNITED STATES of America**

v.

**Yiddy BLOOM, Jerrold Bloom, et al.**

**Crim. No. 77–383.**

United States District Court,
E. D. Pennsylvania.

On Motions to Dismiss and for Bill of
Particulars Nov. 25, 1977.

On Jencks Act Motion Dec. 2, 1977.

On Motions to Dismiss Mail Fraud Counts
and for transfer and severance
Dec. 14, 1977.

On Motion for Production Dec. 19, 1977.

Burton Finkelstein, Finkelstein, Thompson & Levenson, Washington, D. C., for Jerrold Bloom.

Alan J. Davis, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for Dubbin.

James C. Schwartzman, Philadelphia Pa., for DeLoge.

Bernard Hellring, Richard K. Coplon and Richard Shapiro, Hellring, Lindeman & Siegal, Newark, N. J., for Rekoon.

Donald M. Bowman, Gold, Bowman & Unterberger, Philadelphia, Pa., for Freeman and Knoth.

Carmen C. Nasuti, Nasuti, Miller & Fioravanti, Philadelphia, Pa., for Silbiger.

Thomas A. Bergstrom, Philadelphia, Pa., for Salaman.

Walter M. Phillips, Philadelphia, Pa., for London.

Arthur Makadon, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for Ingerman.

J. Shane Creamer, Philadelphia, Pa., for Cronin, Thomas Carroll, Philadelphia, Pa., for Street.

## MEMORANDUM ON MOTION TO DISMISS INDICTMENT

NEWCOMER, District Judge.

Defendants Burton Dubbin, Michael Rekoon, Bernard Cronin, Robert Street and Joseph DeLoge have all attacked this indictment on the ground that it is time-barred.[1] A number of different arguments have been raised, which will be dealt with below. After consideration of these motions, the Court has decided to deny them.

█ A motion to dismiss the indictment, under Fed.R.Crim.P. 12(b)(2), attacks the indictment on its face and is not a device for a summary trial of the evidence. "It is directed only to the question of the validity of the indictment on its face, and its sole function is to test the sufficiency of

Albert J. Wicks, Robert E. Madden, Philadelphia, Strike Force, Philadelphia, Pa., for plaintiff.

E. David Rosen, Rosen & Rosen, Miami, Fla., for Yiddy Bloom.

1. Defendants Jack Silbiger, Jerrold Bloom and Yiddy Bloom have moved to join all motions, and will be regarded *sub silentio* as participating.

the indictment to charge an offense." *United States v. Winer*, 323 F.Supp. 604 (E.D.Pa.1971). A motion based on the statute of limitations may often require outside evidence and may involve evidence which is not capable of determination prior to trial. *See United States v. Dierker*, 164 F.Supp. 304 (W.D.Pa.1958). Furthermore, as a product of the grand jury, the indictment is clothed with the presumption of regularity which attaches to its proceedings. *In re Grand Jury Proceedings*, 486 F.2d 85, 92 (3d Cir. 1973); *Robert Hawthorne, Inc. v. Director of Internal Revenue*, 406 F.Supp. 1098 (E.D.Pa.1976).

■ Defendants Dubbin and Rekoon claim that all portions of the indictment which charge violation of 15 U.S.C. § 78i must be dismissed. They admit that in most respects, the general five-year criminal statute, 18 U.S.C. § 3282, governs this prosecution. However, they point to § 78i(e) as controlling criminal actions brought under that section. That argument is clearly erroneous. By an examination of the language of subsection (e) and a comparison of it with criminal limitations statutes, it is apparent to the Court that § 78i(e) applies only to civil actions. It states that no person shall be *"liable"* for actions, rather than the language used in conjunction with criminal statutes, *i. e.* "No person shall be *prosecuted, tried* or *punished* . . ." 18 U.S.C. § 3282. (emphasis added). Applying the standard rules of statutory construction, the Court is compelled to find that § 78i does not contain any provision limiting criminal prosecutions. Therefore, § 3282 must govern and the limitation period is thus five years. Other courts acting under § 78i apparently have also looked to § 3282 for the limitations period. *See United States v. Stein*, 456 F.2d 844 (2d Cir.) *cert. den.* 408 U.S. 922, 92 S.Ct. 2489, 33 L.Ed.2d 333, *reh. den.* 409 U.S. 898, 93 S.Ct. 101, 34 L.Ed.2d 157 (1972); *United States v. Quinn*, 445 F.2d 940 (2d Cir. 1970), *cert. den.* 404 U.S. 850, 945, 92 S.Ct. 87, 30 L.Ed.2d 90 (1971). Therefore, their motions must be denied.

Defendants Cronin and Street accept the use of the five-year period, but challenge only Counts II and III. Those counts charge substantive violations of §§ 78i(a)(1)(B) and (a)(2). The indictment alleges patterns of behavior "from on or about November 1, 1971 up to and including on or about November 30, 1972," on the part of all defendants. Cronin and Street claim that since the statute bars prosecution for any offenses prior to September 6, 1972, these counts must be dismissed. They suggest that the grand jury may have improperly relied on actions taken prior to that date.

■ Other courts have refused to dismiss indictments under similar circumstances. In *United States v. Andreas*, 374 F.Supp. 402 (D.Minn.1974), the activity was alleged to have occurred both before and after the statutory bar. The trial judge held that since the indictment on its face brought the offenses within the limitations period, dismissal prior to trial would be improper. *See also United States v. Auto Rental Co.*, 187 F.Supp. 603 (W.D.Pa.1960). In a Hobbs Act substantive prosecution, the Court of Appeals for this circuit noted that there was a "unit of prosecution" which contained events on both sides of the statutory bar. "No pertinent issue as to limitation of the action is presented for the [alleged extortionate] payments were carried well into the post limitations period." *United States v. Provenzano*, 334 F.2d 678 (3d Cir.), *cert. den.* 379 U.S. 947, 85 S.Ct. 440, 13 L.Ed.2d 544 (1964). The Court finds that this indictment similarly charges a "unit of prosecution." Since it does so in a timely manner and the grand jury is presumed to have acted properly and to have relied on evidence within the limitations, the motion of Cronin and Street will be denied.

■ Defendant DeLoge claims that the entire indictment should be dismissed as to him, based on what he alleges is "the government's own evidence." This can best be determined at trial, when the government puts in its evidence. Even if the facts are as he alleges, the question of DeLoge's guilt under the conspiracy and mail fraud

counts would have to be judged by the jury. In order to be acquitted under those counts, under which he is alleged to be a co-conspirator or "co-schemer,"[2] he would have to establish the affirmative defense of withdrawal, assuming that he is found to have joined the conspiracy by his alleged contacts with stock. The facts in *United States v. Nowak*, 448 F.2d 134 (7th Cir. 1971), *cert. den.* 404 U.S. 1039, 92 S.Ct. 714, 30 L.Ed.2d 731 (1972), illustrate why this whole issue is best left to trial. The case involved a bank fraud prosecution. The appellant was the bank's attorney and was charged with acquiescing in illegal activity in his capacity. The indictment charged him with no overt act within the limitations period. Prior to the statutory bar, he in fact had resigned as the bank's attorney. The appellate court found however, that since he had not established withdrawal, he was bound as a member of the conspiracy. This Court believes that since a valid conspiracy and scheme are charged, and the nonconspiracy counts are facially proper as discussed above, DeLoge's motion must be denied at this time.

This denial is based in part on the fact that withdrawal, as a question of fact, should be left to the jury. Its proof places the burden on the defendant to establish certain necessary facts. The *Nowak* court said: "[W]ithdrawal requires some affirmative action tending to defeat or disavow the purpose of the scheme, and the abandonment must be complete and in good faith." 448 F.2d at 139. In *United States v. Mardian*, 178 U.S.App.D.C. 207, 546 F.2d 973 (1976), Judge J. Skelly Wright held that termination of active participation in a conspiracy was not sufficient. Quoting *United States v. Borelli*, 336 F.2d 376 (2d Cir. 1964), *cert. den.* 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965), he said: "[W]ithdrawal requires 'either the making of a clean breast to the authorities, . . . or communication of the abandonment in a man-

ner reasonably calculated to reach co-conspirators.'" 178 U.S.App.C.C. at 212, 546 F.2d at 978, n. 5. Therefore, even if a preliminary hearing were held, it would not suffice to show merely the absence of post-limitations overt acts by DeLoge. He would also bear the burden of establishing withdrawal by his own evidence. This sort of mini-trial is singularly unappropriate in a multi-defendant case. Furthermore, it is clear that this issue is committed to the decision of the jury on the facts. Therefore, DeLoge's motion is denied, with the right to renew it at a more appropriate juncture.

## MEMORANDUM ON MOTION FOR BILL OF PARTICULARS

Defendants here are charged under a 31-count indictment that is 49 pages long. Ten of the defendants have moved for bills of particulars. For the general reasons set forth below, their motions will be denied.

The purposes of granting a bill of particulars under Fed.R.Crim.P. 7(a) are "to inform the defendant of the nature of the charges against him (so that he may) adequately prepare his defense, to avoid surprise during the trial and to protect him against a second prosecution for an inadequately described offense." *United States v. Addonizio*, 451 F.2d 49 (3d Cir. 1972), *cert. den.* 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812, *reh. den.* 405 U.S. 1048, 92 S.Ct. 1309, 31 L.Ed.2d 591 (1972). It should only be granted when the indictment is so vague that it will not adequately fulfill these purposes. *United States v. Addonizio, supra; United States v. Frumento*, 405 F.Supp. 23 (E.D.Pa.1975) A bill of particulars is not a matter of right, *United States v. Ahmad*, 53 F.R.D. 194 (M.D.Pa.1971), and the decision lies within the sound discretion of the district court, *United States v. Armocida*, 515 F.2d 49 (3d Cir. 1975), *cert. den. sub nom. Gazal v. United States*, 423 U.S.

---

2. See *United States v. Dukow*, 330 F.Supp. 360 (W.D.Pa.1971), aff'd 465 F.2d 688 (3d Cir. 1972). That court held that in a mail fraud charge under 18 U.S.C. § 1341, the "co-schemer" was bound by the acts of his fellow "co-schemers" as if a conspiracy had been charged under 18 U.S.C. § 371. The Court held that since "co-schemers" had committed overt acts within the statute of limitations and Dukow had not been shown to have affirmatively withdrawn, he was timely prosecuted for mail fraud.

858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975). Although the Federal Rules have been liberalized on this subject, the courts in this Circuit have held consistently that a bill of particulars is not a device for discovery, nor can it be used to seek information protected by the Jencks Act, 18 U.S.C. § 3500.[1] *United States v. Conway*, 415 F.2d 158 (3d Cir. 1969), *cert. den.* 397 U.S. 994, 90 S.Ct. 1131, 25 L.Ed.2d 401 (1970).

Here, the government has answered a large portion of the requests either directly, by reference to other portions of the indictment,[2] or by specifically referring to documents already available for counsel's inspection.[3] The government has made available, early in this case, all of its documentary and tangible evidence and has designated which of this mass will probably be used as trial exhibits. Furthermore, it has agreed to make available large portions of the Jencks material 45 days prior to trial. The Court of Appeals has recognized that extensive pre-trial discovery may obviate much of the need for particulars. *United States v. Kenny*, 462 F.2d 1205 (3d Cir. 1972), *cert. den. sub nom. Kropke v. United States*, 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972). Much of the information sought by counsel has been supplied by reference to specific documents by number. For example, many of the defendants have asked for lists of telephone conversations by date. Although such information is more appropriately sought by a Rule 16 motion, as noted in

*United States v. Smith*, 405 F.Supp. 144 (E.D.Pa.1975), this information was supplied by indicating which document has the information.[4]

■ The defendants are not entitled as of right to a witness list or wide-ranging discovery of the government's trial theories. *United States v. McCullough*, 427 F.Supp. 246 Cr. No. 76–413 (E.D.Pa.1977).[5] In *United States v. Armocida*, the district court's denial of the request for the "when, where and how" of the overt acts not alleged was sustained by the Court of Appeals.[6] The appellate court said that this was "tantamount to a request for 'wholesale discovery of the Government's evidence,' which is not the purpose of a bill of particulars under (Rule) 7(f) (citations omitted)." 515 F.2d at 54. Other district courts have denied narrowing the indictment by particulars in conspiracy cases such as the one at bar. In *United States v. Ahmad, supra* at 199, that court explained:[7]

"Granting particulars concerning the formation of the conspiracy, the place and date of each defendant's entrance into the conspiracy, the substance, or a copy, of the conspiracy agreement and specifications of the manner in which the conspiracy operated would unduly limit the government's proof at trial. Moreover, if defendants were given the minutiae they seek, the slightest discrepancy between the particulars and the evidence

1. The following requests in effect seek Jencks Act material: Dubbin I–F, DeLoge V, VI.

2. This method was noted and sustained in *United States v. Armocida*, 515 F.2d 49 (3d Cir. 1975), *cert. den. sub nom. Gazal v. United States*, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975). See answers to requests of: Dubbin I–D, I–E; Freeman 2, 3, 6; Knoth 1. 3; London I–C·, I–H; Rekoon 1–2, 4, 34, 45, 54.

3. See government's response to Requests of: Yiddy Bloom 4, 9; Jerrold Bloom I(c)–1 through 3, I(c)· 7 and 8, I(d)–2, I(e)–3 and 4, I(f)· 2, I(h)–1 and 2, J(b), K(b) and (c), K(e); Rekoon 5, 21, 29–32, 50, 59, 63–64, 68; Freeman 4; Dubbin I–G, I–H, I–J, I–K, I–L; DeLoge I G, I–H, III–A; Knoth 2, 6–8; Cronin and Street I–E, London I–F, I–G, I–H, I–J, I–K, I–L. Furthermore, some answers referred the defendant to his own statement, *e. g.* DeLoge I–A.

4. See government's response to the following requests: DeLoge I–F; Knoth 5; London I–D; Dubbin I–C; Jerrold Bloom I(a); Rekoon 19, 27.

5. In effect, a number of defendants have requested witness lists. See Requests of: Dubbin I–I, Yiddy Bloom 6–A, 7–A, 8–A, 11–A.

6. See Requests of: London I–M, Cronin and Street I–C.

7. This is the basis for denying the following requests: Dubbin I–B; London I–B; Cronin and Street I–F; Jerrold Bloom A–1, A–3, A–4 and those requests not answered by the government under "Manner of the Conspiracy."

at trial would open the door to defendants' attempts to confuse the jury."

■ Defendants, in many of their requests, seek virtually a complete script of the government's case against them. They are not entitled to know every fact of the government's case, nor are they required to be informed of precisely what significance the government assigns to each fact.[8] In *United States v. Addonizio, supra,* the Court of Appeals noted: "It is true that the Government did not, at the pre-trial stage, weave the information at its command into the warp of a fully integrated trial theory for the benefit of the defendants, *nor were they required to do so.*" 451 F.2d at 64 (emphasis added). In the instant case, where all the documentary evidence is available,[9] and has even been catalogued by the prosecutor, where a substantial portion of the Jencks Act material will be made available well in advance of trial and where the indictment itself is clear and definite, the Court does not find that the granting of the requests for particulars not already complied with by the government would be proper. Therefore, the motions will be denied.

## MEMORANDUM ON MOTION TO DISMISS COUNT 1

Defendants Joseph DeLoge, Bernard Cronin and Robert Street, as joined by others, have moved to dismiss Count I of this indictment. They contend that this charge under 18 U.S.C. § 371 contains improperly joined conspiracies.

Defendant DeLoge notes that he is charged with only one overt act and had only minimal contact with the indicted co-conspirators. Therefore, he reasons, he is not a member of the same conspiracy. He claims that there are two or more conspiracies alleged in the single count. Defendants Street and Cronin claim that the multi-objective single conspiracy will be confusing to the jury. Unfortunately, none of the defendants explain their arguments in any helpful detail.

■ This Court believes that where a single conspiracy count charges a general plan with a single illegal goal—here, to artificially raise a stock's price—that a single conspiracy count is proper. In *United States v. Kenny,* 462 F.2d 1205 (3d Cir.) *cert. den. sub nom. Kropke v. United States,* 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972), the Court of Appeals considered a similar problem under the Hobbs Act. Appellants argue that the proof showed multiple unrelated conspiracies lumped into one count, which would be violative of the Supreme Court's rule in *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). The appellate court said:

> "*Kotteakos* prohibits charging multiple unrelated conspiracies, but it does not prohibit charging one master conspiracy and establishing at trial that under the master conspiracy more than one subsidiary scheme was involved."

In *Kenny,* as in the instant indictment, there were allegations of a general scheme, with one individual at its head. Members of the conspiracy operated portions of the conspiracy in different locales. The *Kenny* court said: "The pattern of conduct reflected in the evidence is that of a determined group who repeatedly cooperated closely to achieve the common purpose of self-enrichment by extracting kickbacks." 462 at 1217. In this indictment, the alleged

---

8. See Requests of: Yiddy Bloom, 2, 3, 5–8, 11, 13, 16; Jerrold Bloom A–5, b through H, J, J(a), K, K(a), K(f) through (k), requests under "Overt Acts," "Counts Two Through Thirty-one," "Counts Four Through Thirty-one;" Dubbin I–M, I–N, II–A; DeLoge I–E, II–A, II–B, III–B, IV–A, IV–B; Freeman 5, 7; Knoth 1, 3, 4, 9–13; London I–I, I–j, I–k, I–l; Cronin and Street 1–b, 1–d, 2–b, 3–b; Rekoon 7–18, 20, 22–26, 28, 33, 37–41, 43–44, 46–47, 51–53, 55–56, 60–62, 65.

9. This factor is especially important in this case, since a securities fraud case, such as the one at bar, is built primarily upon documentary proof. By having access to these documents at an early stage the defendants have been made privy to the bulk of government's case and may prepare accordingly.

pattern is of a group who worked toward the common goal of raising the Magic Market stock price. That is a consistent goal, even though each co-conspirator's activity might have been different. In *United States v. Projansky*, 465 F.2d 123 (2d Cir.) *cert. den.* 409 U.S. 1006, 93 S.Ct. 432, 34 L.Ed.2d 299 (1972), that court found that manipulating and maintaining a stock price was a common goal and that varied activities were properly charged in a single conspiracy count.

On its face, Count I charges a single conspiracy with multiple subsidiary objectives. At trial, the Court will properly charge the jury to avoid any confusion. Therefore, there does not seem to be any need to require the prosecution to elect among "objectives," as Cronin and Street have requested, as there is properly one main objective. The motions to dismiss Count I will be denied.

## MEMORANDUM ON JENCKS ACT MOTION

Defendant Abraham Salaman, joined informally by Albert London, Burton Dubbin and Yiddy Bloom, has requested that the Court enforce its order of October 12, 1977, in that the government has not yet delivered to them the material to be produced under the Jencks Act, 18 U.S.C. § 3500. Furthermore, he requests that the Court order the government to assume the costs of having copies of this material made for each defendant.

■ This is a complex, multi-defendant case, the trial of which threatens to extend over months. In order to expedite trial time and to allow defendants to fully prepare their defenses prior to trial, the Court issued an order regulating pre-trial procedures. One portion of that order dealt with the production of Jencks Act material. The government consented to make available at least half of this material at least 45 days prior to trial. That date arrived on November 25, 1977, and the government informed the defendants that the material was available for inspection and copying at the prosecutor's offices. They were told that they

might order copies of any of the material they desired by contacting the copying company. This reproduction was to be at their own cost. Defendants now complain that the government has not produced the materials, since they have been informed by the copying office that copies cannot be delivered before December 1. Even assuming that this is true, which the government denies, the Court is of the opinion that by making the material available for inspection and copying as of the proper date, the government has complied with the intent of the pre-trial order.

■ However, the Court must note, as did Judge Fullam in *United States v. Goldberg*, 336 F.Supp. 1 (E.D.Pa.1971), that production of the Jencks material prior to trial lies within the discretion of the government. As noted in *United States v. Spagnudo*, 515 F.2d 818 (9th Cir. 1975), "The purpose of the Jencks Act is to restrict judicial power to order discovery against the government in criminal cases." *Supra* at 821. Although courts may advise, urge and request the government to turn over the Jencks Act material at a pre-trial stage, *see United States v. Goldberg* and *United States v. Spagnudo*, they may not compel its production. In fact, one court of appeals issued a writ of mandamus ordering the district court to rescind its order that required the government to turn over Jencks material prior to trial. *United States v. McMillen*, 489 F.2d 229 (7th Cir. 1972), *cert. den. sub nom. Siegel v. McMillen*, 410 U.S. 955, 93 S.Ct. 1420, 35 L.Ed.2d 687 (1973). In the instant case, the government has partially waived its protection under the Jencks Act. However, the Court does not believe that this partial waiver entitles the Court to extend its interference with the government's discretion under the Act beyond the terms of the October 12 order.

That order required the government to "permit the defendants to inspect and copy" that portion of the Jencks material made available 45 days prior to trial. It did not seek to impose upon the government the significant costs of making copies of all the

material for each of the now-13 defendants. Estimates of the costs of reproduction in this case have ranged from $700 to $1,000. Multiplied by 13, that would amount to a large burden for the government to assume.

Defendant contends that the language of the Act requires the government to produce for each defendant an individual copy of the witnesses' statements. He refers to the use of the word "deliver" in subsections (b) and (c) of the statute. The Court notes that both subsections (a) and (b) require the government to "produce" the statements for defendants' use. Therefore, it does not appear that any fine differentiation of words will shed much light upon this problem, since the two words, which have significantly different meanings for the issue at hand, have been used in the Act interchangeably. Furthermore, the Court's review of the cases dealing with the Act shows that most courts also use these words freely. Courts refer to "inspection," which would indicate that the government would not have to supply copies. At other times, they speak of "production" or the requirement to "deliver." It is clear that, from the wording of the Act or from most judicial rephrasings of it, the Court will get no guidance on this issue.

Only one case makes any reference to the use of the statements by multiple defendants. In *Sendejas v. United States*, 428 F.2d 1040 (9th Cir.), *cert. den.* 400 U.S. 879, 91 S.Ct. 127, 27 L.Ed.2d 116 (1970), that court said the trial judge did not err in denying a continuance when the three defendants' counsel had received access to the statement the evening before cross-examination of a government witness. Only one copy was provided for the three defendants. The trial judge required them to go ahead with their cross-examination, even though they had been forced to share the single copy. In the case presently before this Court, the defendants' counsel may go to the prosecutor's office and inspect the documents if they are unable to afford wholesale copying. Furthermore, if they should decide that, upon such inspection, they should desire to have only a few documents copied, they may so select. It would penal-

ize the government, which has produced material which pertains to prospective witnesses who in fact may not be called, to order them to have all these copied, since they would only be required to turn the statements as to the witnesses actually testifying were they to wait until trial. The Court will not order the government to assume the costs of pre-trial copying of the Jencks material. The Court does not wish to inhibit the government from making this material available pre-trial in other cases as complex as the one at bar. Where there is access to the materials by inspection at the prosecutor's office, the Court does not see that such a decision would work any fundamental unfairness, especially where it is not clear that the movant would be entitled to individual, government-subsidized copies at the time of trial. The government's voluntary waiver of the Jencks Act does not allow the defendants to any rights they would not otherwise have. *United States v. Williams*, 536 F.2d 1202 (7th Cir. 1976).

## MEMORANDUM ON MOTION TO DISMISS MAIL FRAUD COUNTS

Defendants Abraham Salaman, Jerrold Bloom, Bernard Cronin, and Robert Street seek to have counts 4 through 31 of the indictment dismissed. These counts pertain to the charges under the mail fraud statute, 18 U.S.C. § 1341. For reasons set forth in this memorandum, the motions to dismiss will be denied.

Defendant Salaman seeks first to attack these mail fraud counts as being duplicitous. "Duplicity is the joining in a single count of two or more distinct and separate offenses." *United States v. Starks*, 515 F.2d 112 (3d Cir. 1975). Any analysis of whether the acts alleged in the counts charged more than one offense must start with the statute. *United States v. Zeidman*, 540 F.2d 314 (7th Cir. 1976). The mail fraud statute charges a single offense which may be accomplished by a variety of means. These means are listed in the statute disjunctively. However, counts 4 through 31 of this indictment, although sub-

stantially tracking the language of the statute, charge that the defendants employed all of the means. The use of the conjunctive instead of the disjunctive traditionally does not render an indictment duplicitous. *United States v. Addonizio,* 313 F.Supp. 486 (D.N.J.1970), *aff'd,* 451 F.2d 49 (3d Cir.) *cert. den.* 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972); *United States v. Laverick,* 348 F.2d 708 (3d Cir.), *cert. den.* 382 U.S. 940, 86 S.Ct. 391, 15 L.Ed.2d 350 (1965). The charging of multiple means towards a single offense is common in a mail fraud situation where a single multifaceted scheme may involve many acts to be performed in furtherance of it. *United States v. Zeidman, supra.* Therefore, defendant Salaman's attack on these counts as duplicitive must fail.

▆▆▆ Defendant Bloom charges that the counts suffer from the similarly fatal flaw of multiplicity. Multiplicity occurs when counts duplicate each other. "Multiplicity [is], the charging of a single offense in several counts . . .", *United States v. Starks, supra* at 116. Defendant Bloom contends that the counts should be consolidated into a single charge of mail fraud or that the prosecutor should be required to elect among them and proceed only on a single count at trial. As this Court has noted on a recent occasion, multiplicity is not usually a proper attack on an indictment at the pretrial stage. In most cases multiplicity can only be judged after the court has heard all the evidence. *See United States v. Davis,* C.R. 77–291 (E.D.Pa. September 14, 1977) and cases cited therein. However, in the instant case it is clear to the court on the face of the indictment that it is not multiplicitous as alleged by defendant Bloom. He argues that the counts are multiplicitous because, although such count alleges a single mailing in furtherance of a scheme to defraud, the fact that only one scheme existed requires that only one mail fraud be charged. This is not presently the law under § 1341. In *United States v. Schall,* 371 F.Supp. 912 (W.D.Pa.), *aff'd Appeal of Nikolich,* 503 F.2d 1399, 503 F.2d 1400 (3d Cir. 1974), *cert. den.* 420 U.S. 993, 95 S.Ct. 1432, 43 L.Ed.2d 676, *reh. den.* 421

U.S. 972, 95 S.Ct. 1970, 44 L.Ed.2d 463 (1975), that court rejected similar arguments regarding a mail fraud indictment. Citing numerous cases, that court said, "Courts have consistently held that each mailing constitutes a separate offense and that the counts of an indictment charging separate and distinct mailing offenses involving the same scheme to defraud cannot be dismissed as multiplicitous." *Accord United States v. Tiche,* 424 F.Supp. 996 (W.D.Pa.1977); *United States v. Bush,* 522 F.2d 641 (7th Cir. 1975), *cert. den.* 424 U.S. 977, 96 S.Ct. 1484, 47 L.Ed.2d 748, *reh. den.* 425 U.S. 986, 96 S.Ct. 2194, 48 L.Ed.2d 811 (1976). Since each of these 27 counts charge a separate act of mailing and the indictment does not appear to be so prolix as to cause prejudice to the defendants, it will not be dismissed as multiplicitous.

▆▆▆ Defendants Bloom and Salaman also contend that the mail fraud counts are insufficient to charge an offense under § 1341 since they do not allege a mailing "in furtherance of" a scheme to defraud. The question that a district court must ask in reviewing the sufficiency of an indictment to charge an offense is not whether the indictment states an offense fully on its face, but whether the indictment contains such allegations that may be proven by evidence at trial that would support a conviction under the statute. *United States v. Castor,* 558 F.2d 379 (7th Cir. 1977), *citing United States v. Sampson,* 371 U.S. 75, 76, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962). In reversing a district court's dismissal of a mail fraud indictment for failure to state the "in furtherance" element, that court said: "The resolution of the question of whether the mailings were in furtherance of the scheme must await trial 'unless it so convincingly appears on the face of the indictment that as a manner of law there would be no necessity for such delay' *United States v. Feinberg,* 50 F.Supp. 976 (E.D.N.Y.1973), *aff'd* 140 F.2d 592 (2nd Cir.) *cert. den.* 322 U.S. 726, [64 S.Ct. 943, 88 L.Ed. 1562]. . . (1944). . . . [A]n indictment setting out the mailings charged and alleging that they were in furtherance of the scheme

should not be dismissed as insufficient on its face unless there is no conceivable evidence that the government could produce at trial to substantiate its 'in furtherance' allegations." *Supra* at 384–385. With this limitation in mind the court will examine the indictment to determine its sufficiency to charge an offense.

In the indictment, the government has alleged a complicated scheme to raise the price of Magic Marker stock to an artificially high level. An integral part of this scheme as charged was to induce buyers to purchase the stock. These purchases not only enhanced the appearance of the stock and induced yet other buyers to purchase it, but the increasing numbers of purchases raised the price of the stock through supply and demand. Therefore, the successful completion of purchases by unrelated individuals was of central importance to the stock manipulation scheme.

Counts 4 through 31 allege 27 mailings to individuals, not charged or mentioned as co-conspirators, of confirmation slips. These confirmation slips are required by the regulations of the Securities and Exchange Commission. They have a number of legal significances. Under the Uniform Commercial Code, a confirmation slip may satisfy the statute of frauds and be a binding contract of sale on both parties under certain circumstances. UCC 8–319(c); *Byrnes v. Faulkner, Dawkins and Sullivan,* 550 F.2d 1303, 1310 (2d Cir. 1977). Furthermore, since the confirmation slips are required by the SEC, they are indices of the regularity of the sale. *See United States v. Pollack,* 175 U.S.App.D.C. 227, 534 F.2d 964 (1976). In *United States v. Benigno,* CCH Fed.Sec.L.Rep. ¶ 95,812 at 90,931 (S.D.N.Y. October 6, 1976) that court said that the function of the confirmation slip was to notify the seller of stock that he must deliver the proper number of shares sold in order to receive payment for those shares. That court rejected the defendants' argument that confirmation always occurs and was merely a ministerial duty of adjusting accounts between brokerage houses.

■ A number of other courts have considered the issue of whether mailing of confirmation slips is sufficiently closely related to a scheme to defraud in the sale of stock in order to be chargeable under § 1341. These courts have universally held that such mailings are adequate to support a charge of mail fraud. *United States v. Ashdown,* 509 F.2d 793 (5th Cir. 1975); *United States v. Pollack, supra* ; *United States v. Marando,* 504 F.2d 126 (2d Cir.), cert. den. sub nom. *Berardelli v. United States,* 419 U.S. 1000, 95 S.Ct. 317, 42 L.Ed.2d 275 (1974); *Cf. United States v. Cohen,* 518 F.2d 727 (2nd Cir. 1975); *McDaniel v. United States,* 343 F.2d 785 (5th Cir. 1965); *United States v. Brown,* 555 F.2d 336 (2nd Cir. 1977) (mailing of confirmation slips provides jurisdiction for criminal charges under the Securities Act). The court has examined these decisions, the interpretations of § 1341 by the United States Supreme Court and the Court of Appeals for the Third Circuit, and has decided that these counts sufficiently charge an offense under the mail fraud statute.

■ First of all, it is not a requirement that the mailing be essential to the scheme to defraud. It need only further such a scheme. *United States v. Adamo,* 534 F.2d 31 (3d Cir. 1976); *Pereira v. United States,* 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954). In *Castor* the Court of Appeals for the Seventh Circuit held that if a mailing was "a normal concommitant" of a transaction that is essential to the fraud, such a mailing satisfies § 1341. In its most recent construction of the mail fraud statute, this Circuit's Court of Appeals overruled a district court and found that a mailing was not properly connected to a fraud. In *United States v. Tarnopol,* 561 F.2d 466 (3d Cir. 1977), the court noted that the mailings there involved did not further any scheme but in fact worked against the scheme by allowing a risk of disclosure. In the instant case, the mailing of the confirmation slips clearly works in furtherance of the scheme. The completion of legitimate sales of Magic Marker stock was an essential element of the alleged plan to defraud. If these sales were not properly consummated under SEC

regulations, and were not finalized by the documents of confirmation, then the price of the stock would not have risen. Unlike in *Tarnopol*, there is no evidence that the confirmation slips would have led to an earlier discovery of the crime alleged.

*Tarnopol* also noted that the mailing involved in that case was a routine business procedure which was uniformly followed whether or not the mailing was involved in the scheme. Defendants have pointed out that the mailing of confirmation slips, required by law, are also routine business mailings. However, the instant case differs from *Tarnopol* as well as from the Supreme Court cases cited by the defendants, *Kann v. United States*, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944) and *Parr v. United States*, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960). Although as in *Parr*, the mailings are required by law, and as in *Kann* and *Tarnopol*, they take place in all transactions whether part of the fraud or not, these mailings have a more integral part in the scheme to defraud. In fact, the scheme cannot succeed without them, unlike as in *Kann, Parr* and *Tarnopol*. Since the sales which they consummate themselves further the scheme to defraud by increasing the activity in Magic Marker stock and raising the price, these confirmation slips as a "normal concommitant" of the sales must be considered an integral part of the overall plan. Therefore, the mailings resemble those in *Pereira* and *Adamo* more than the cases cited earlier. In *Pereira*, checks were deposited for collection in a bank account. Since the checks had to be mailed to another bank in order for the defrauder to recover the money into his own account, the Supreme Court held that such mailings were in furtherance of the scheme. In *Adamo* a credit card scheme included the participation of two merchants. Since they needed to mail the credit slips to the bank in order to recover payments for goods allegedly charged in their stores, it was held that such mailings satisfied § 1341. In *Pollack* and *Marando*, those courts followed this logic in holding that confirmation slips were integral parts of sales necessary to a scheme to defraud

and thus could be the basis of a mail fraud charge.

Another reason the mailings are sufficiently connected to the alleged scheme to defraud can be found in an examination of *United States v. Sampson*, 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962). The court there said that mailings subsequent to the culmination of a scheme can in some circumstances provide the basis for a mail fraud charge. In that case, receipts were mailed to customers for the purpose of "lulling" them by assurances that the services paid for would in fact be performed. In *United States v. Cohen*, and *United States v. Marando*, those courts relied on the role of the confirmation slips as guarantees of regularity under the *Sampson* theory. In *United States v. Pollack*, the court noted that the confirmations had helped to assure the purchasers of the stock that a valid sale had been made. Therefore, the Court finds that the mailings of the confirmation slips alleged in counts 4 through 31 will suffice to defeat the motion to dismiss the indictment at this stage. Should the Court find, after a full trial of the evidence, that the mailings in fact had little or no connection to the alleged schemes to defraud, the counts may then be dismissed.

▬ Defendant Jerrold Bloom further argues, however, that the counts should be dismissed as to him since he did not in fact "cause" the mailings. Causation can be proved by a "but for" relationship between the transactions of the scheme to defraud and the mailings themselves. *United States v. Staszuck*, 502 F.2d 875 (7th Cir. 1974), *mod'd en banc* 517 F.2d 53, 7 Cir., *cert. den.* 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975). It is not a requirement that a person charged under § 1341 actually deposits any thing in the mail himself. "Where one does an act with the knowledge that use of the mails will follow in the ordinary course of business, or even where such an act can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used." *Pereira, supra* 347 U.S. at 8 through 9, 74 S.Ct. at 362. In two cases involving mailing of con-

firmation slips, the mailings were done by non-participants to the scheme to defraud, in both cases brokerage houses, as in the case at bar. Both those courts held that the defendants had "caused" the mailings. *United States v. Benigno, supra* ; *United States v. Clark*, 359 F.Supp. 128 (S.D.N.Y. 1973). *See also United States v. Keane*, 522 F.2d 534 (7th Cir. 1975), *cert. den.* 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746 (1976). Thus, if the confirmation slips were mailed because sales were consumated in connection with the scheme to defraud, it can properly be held that the defendants "caused" these mailings.

 Furthermore, if any act of any defendant charged under the mail fraud statute "causes" the mailings, these acts can be imputed to all members of the conspiracy, assuming that there is proof that that defendant joined the conspiracy. In *United States v. Dukow*, 330 F.Supp. 360 (W.D.Pa.1971), *aff'd* 465 F.2d 688 (3d Cir. 1972), the court said that if a defendant with a criminal intent to defraud joined a scheme to defraud and thus became part of it, he is guilty as if he had fully participated in every act. In *United States v. Tiche, supra*, that court noted specifically that a defendant was responsible for letters which another member of the mail fraud scheme had caused to be mailed in execution of this scheme. Therefore, if any member of the alleged scheme is found to have caused the mailing of the confirmation slips by his own acts, those acts and thus the causation can be imputed to Jerrold Bloom, if he is found to have been a member of the mail fraud scheme. *Accord, United States v. Schall, supra.* Since evidence may be adduced at trial to support the allegations of the indictment sufficiently in this respect, the indictment will not be dismissed.

 Defendant Bloom further contends that the indictment should be dismissed as to him because it does not charge that he sought to obtain money or property by means of the scheme. This is patently wrong from the face of the indictment. Counts 4 through 31 incorporate by reference paragraphs 10 through 18 of count one, the conspiracy count. Paragraph 12 shows that defendant Jerrold Bloom purchased a number of shares of stock in his own name and the name of his wife. Taking the allegations of the indictment as true, as the court must on a motion to dismiss, the purchase of this stock with a criminal intent to benefit from the manipulation of the price can establish that Bloom intended to profit from the scheme to defraud. In addition, it is accepted law that under a mail fraud charge, the government need not prove that the attempted fraud actually succeeded or that an individual victim was defrauded. *United States v. Keane, supra.*

Defendants Cronin and Street seek to have the mail fraud counts dismissed because they assert that they do not adequately describe the alleged scheme. Since the counts incorporate by reference the detailed description of the manner of the conspiracy alleged in count one, the court feels that the indictment adequately informs them of the charges against them. Therefore their motion to dismiss will be denied.

### MEMORANDUM ON MOTION FOR TRANSFER

Defendants Yiddy Bloom, Jerrold Bloom, Burton Dubbin and Robert Knoth have moved for transfer of their cases to the Southern District of Florida. Defendant Joseph DeLoge has requested transfer to the Middle District of Florida. For reasons set forth below, these motions for change of venue under Fed.R.Crim.P. 21(b) will be denied.

 Rule 21(b) provides for the transfer of criminal cases "for the convenience of parties and witnesses, and in the interest of justice." No one challenges the constitutional propriety of venue. The Constitution requires that the trial must be held in the state and district where the crime was committed. In a conspiracy case, a conspirator may be tried in a district with which he has had no contact if his co-conspirators have committed overt acts there. *United States v. Boyance*, 329 F.2d 372 (3d

Cir.), *cert. den. sub nom. Feldman v. United States*, 377 U.S. 965, 84 S.Ct. 1645, 12 L.Ed.2d 736 (1964). Here, however, it appears that the movants did in fact have substantial contacts with this district. The indictment charges events that occurred in Philadelphia, New York, Miami Beach and Washington, D. C. In *United States v. Ashdown*, 509 F.2d 793 (5th Cir.), *cert. den.* 423 U.S. 829, 96 S.Ct. 48, 46 L.Ed.2d 47 (1975), many substantive contacts connected that stock fraud case to the place of trial: 1) one defendant lived there; 2) the mailings were made to and from there; 3) some victims lived there; 4) checks were deposited in a local bank; and 5) the corporation involved was headquartered there. In the instant case, a list of contacts at least as significant can be made up: 1) some defendants and co-conspirators resided here; 2) a number of the brokerage firms allegedly used are located here, through which stock passed; 3) a number of stock purchases were made in this district; and 4) the mailings alleged as overt acts and as the basis of the mail fraud counts were either into or out of this district. Therefore, this district is a proper forum to try this case in the constitutional sense.

■ Defendants argue that Philadelphia is an inconvenient forum and trial here will work a hardship on them. *Platt v. Minnesota Mining and Mfg. Co.*, 376 U.S. 240, 84 S.Ct. 769, 11 L.Ed.2d 674 (1964), listed criteria that should be considered in reviewing such a motion. These factors are: 1) location of the defendant; 2) location of possible witnesses; 3) location of events likely to be in issue; 4) location of documents and records likely to be involved; 5) possible disruption of defendants' business unless the case is transferred; 6) expense to the parties; 7) location of counsel; 8) relative accessibility of place of trial and 9) docket condition of each district involved. Weighing these factors, the Court has concluded that no transfer is required.

■ It is well settled that motions under Rule 21(b) are addressed to the trial court's discretion. *United States v. Farries*, 328 F.Supp. 1034 (M.D.Pa.1971), *aff'd* 459

F.2d 1057 (3d Cir.), *cert. den.* 409 U.S. 888, 93 S.Ct. 143, 34 L.Ed.2d 145 (1972). As Judge Ditter stated: "It will always be true that any trial will result in some inconvenience to both parties . . . so that the defendant must show substantial inconvenience or his motion will be denied." *United States v. Green*, 373 F.Supp. 149 (E.D.Pa.), *aff'd* 505 F.2d 731 (3d Cir. 1974), *cert. den.* 420 U.S. 978, 95 S.Ct. 1405, 43 L.Ed.2d 659 (1975). The reasons for transfer must override the general rule that a criminal prosecution should be retained in the original district. *United States v. Wolfson*, 269 F.Supp. 621 (S.D.N.Y.1976), *aff'd* 405 F.2d 779 (2d Cir. 1968), *cert. den.* 394 U.S. 946, 89 S.Ct. 1275, 22 L.Ed.2d 479 (1969).

■ Here, the five movants reside in the districts to which they seek transfer. However, of the remaining defendants named in the indictment, three live in the Philadelphia area, three in New York, one in Maryland and one in Massachusetts. For these eight defendants, as well as for seven of the nine unindicted co-conspirators, Philadelphia would be more convenient. Defendants' residence is a factor to be considered, but it is not controlling. *United States v. Polizzi*, 500 F.2d 856 (9th Cir. 1974), *cert. den.* 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975). Furthermore, the convenience of the prosecutor, and resultant delay if a new one needs to be assigned the case in a new district, are also countervailing factors to the defendants' residence. *Jones v. Gasch*, 131 U.S.App.D.C. 254, 404 F.2d 1231 (1967).

■ The next major factor to be considered is the location of possible witnesses. Only one of the movants, Burton Dubbin, has filed any factual support for the motion, and that affidavit does not give the Court any firm idea as to where the witnesses are located. In *United States v. Noland*, 495 F.2d 529, 534 (5th Cir.), *cert. den.* 419 U.S. 966, 95 S.Ct. 228, 42 L.Ed.2d 181 (1974), the appellate court sustained the Rule 21(b) motion's denial, contending that the appellant had "failed to demonstrate specific facts from which the District Court could have concluded that the convenience

of witnesses and the interests of justice required transfer." In *United States v. Kelly*, 467 F.2d 262 (7th Cir. 1972), *cert. den.* 411 U.S. 933, 93 S.Ct. 1905, 36 L.Ed.2d 393, *reh. den.* 412 U.S. 923, 93 S.Ct. 2738, 37 L.Ed.2d 151 (1973), that court noted that the allegations of inconvenience to witnesses were not supported by any witness list. The denial of transfer by the district court was sustained.[1] However, the Court will look to briefs for some guidance here. The government claims that only a small percentage of its witnesses reside in Florida, with most living in the East Coast corridor. Defendant Dubbin contends that he will call 12 Floridians as character witnesses and that he knows of others who may be called in his defense on the facts. Defendant Knoth complains about the inability to call character witnesses, but does not indicate a definite intent to call any. Although this Court acknowledges the importance of character witnesses, their numbers may be limited in the Court's discretion. Thus, the apparent impact will not, in fact, fall on as many people as it may now appear, *Jones v. Gasch, supra*. Jerrold Bloom claims that his unspecified and unnumbered witnesses from Florida will probably be delayed due to "inclement weather" and such delay will cause prejudice to him. Judge Ditter rejected such a claim on a new trial motion in *United States v. Green*, noting that there was no proof that lateness cast any aspersions on the defendant and furthermore, there was no proof that such lateness would not have similarly occurred in the proposed forum. In *United States v. Wolfson, supra* at 624, a stock fraud case in which defendants requested transfer to Florida, the district court said it had "sufficient power and latitude in the management of the trial to take account of matters which seriously af-

fect the convenience of parties or witnesses." Viewing all of these allegations and the counterbalancing facts, the Court finds that the convenience of witnesses, for both sides, does not require transfer.

The events alleged in the indictment are to have occurred all over the eastern United States. As noted above, a number of them took place in this district. In a scattered conspiracy such as this, no one forum would accommodate the entire case. *United States v. Polizzi, supra*; *United States v. Smith*, 412 F.Supp. 1 (S.D.N.Y.1976). The Court finds that the constitutional propriety of venue satisfies this factor.

Many of the documents to be involved in the case are already located in Philadelphia, having been secured by the grand jury. Similarly, all of the defendants are represented by local counsel, with the Philadelphia lawyers filing three of the five transfer motions. A move to Florida would require involvement of new counsel and a delay of time, as they attempted to acquaint themselves with the massive case and evidence. Government's counsel and investigators are also located here, a factor considered significant in *Jones v. Gasch, supra*. These all therefore militate against transfer.

Two factors weigh strongly in favor of transfer, being aggravated by the proposed length of trial. All defendants have alleged, and quite expectedly so, that an extended out-of-town trial would harm their business and cause them to incur great expense. In a criminal trial, where a defendant must be present every day in court, any location is bound to cause some significant interference with business. However, these factors must be considered with all others,

---

1. This Circuit's appellate court has said relatively little about transfer of criminal cases, but has laid out a number of explicit rules to be followed in considering a civil transfer under 28 U.S.C. § 1404, a statute which contains the same criteria as Fed.R.Crim.P. 21(b). In *Plum Tree, Inc. v. Stockment*, 488 F.2d 754 (3d Cir. 1973), Judge Van Dusen told the district courts that they must have made a factual record, other than allegations of briefs, to support a transfer decision. That opinion also noted that

the courts must consider three separate interests—the parties' convenience, the witnesses' convenience, and the interests of justice—in arriving at the decision. The lack of a record as here alone would be enough to defeat a civil transfer motion, as Judge Gorbey held in *Petersen v. Stewart Title Guaranty Co.*, C.A. No. 77–347 (E.D.Pa. July 13, 1977), but in this criminal case, it will merely be considered as one of the factors.

including the government's expenses in moving its prosecution machinery to another district. As an appellate court noted in a multi-defendant stock and mail fraud case on the West Coast: "It might well have been more convenient to one or more defendants to have had a change of venue to one or more districts, but that reason is insufficient to *require* the trial judge to order a change of venue." *Wagner v. United States,* 416 F.2d 558 (9th Cir. 1969), *cert. den.* 397 U.S. 923, 90 S.Ct. 915, 25 L.Ed.2d 104, 397 U.S. 1015, 90 S.Ct. 1249, 25 L.Ed.2d 429 and 399 U.S. 915, 90 S.Ct. 2218, 26 L.Ed.2d 572 (1970) (Emphasis in original).

Philadelphia, served by railroads and major airlines is an accessible location, even for the Florida defendants. As in *Wolfson,* the Court takes judicial notice of the availability of these facilities and finds that this factor does not favor transfer.

Finally, the question of the speed of trial must be considered. This Court has set a date certain for this trial. It is scheduled to begin in less than forty-five (45) days. Although this Court is not aware of the state of the Florida district's dockets, there is little possibility that, if transferred, this case would go to trial any faster there than has already been arranged for here. That factor weighs very heavily against any transfer. *United States v. Polizzi, supra; United States v. Smith, supra.*

Finally, the Court must look to another important factor, although not listed in *Platt*—that of judicial economy. In *United States v. Corallo,* 281 F.Supp. 24 (S.D.N.Y. 1968), defendants wanted their joint trial split, to be tried in several different districts. The court observed that it should consider the factor of duplication of trials, when as here some of the defendants had not requested transfer. In *United States v. Smith, supra* at 4, the conspiracy charged had taken place in three states and the District of Columbia. The New York district judge denied transfer, stating that it was "the Court's view that the interests of justice and judicial economy would be enhanced by trying all the defendants in the same district." This Court has already explained, in ruling on the motions for severance, why judicial economy will be served by a joint trial. Joint trials are especially desirable in a conspiracy trial such as this, when separate trials would be quite repetitive and complex. Since venue is constitutionally proper, the *Platt* factors do not mandate transfer and a single trial would best serve the interests of justice and judicial economy, the motions to transfer are denied.

## MEMORANDUM ON MOTION FOR SEVERANCE

Defendants, who are jointly charged in a 31-count indictment, have moved for severance of their cases into individual trials under Fed.R.Crim.P. 14.[1] For reasons set forth below, these motions will be denied.

Rule 14 provides:

"If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of courts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial.

In this Circuit, as in others, it is firmly established that the decision to sever is committed to the discretion of the trial court and will only be disturbed if abuse of that discretion can be shown. *United*

---

1. Defendants Yiddy Bloom, Jerrold Bloom, Bernard Cronin, Joseph DeLoge, Burton Dubbin, Myron Freeman, Robert Knoth, Albert London, Michael Rekoon, Abraham Salaman and Robert Street have filed motions for separate trials under Fed.R.Crim.P. 14. Defendant Robert Knoth has filed a motion for severance and transfer, and has presented arguments only under Fed.R.Crim.P. 21. Therefore, his motion will be considered with the others seeking change of venue.

*States v. Segal,* 534 F.2d 578 (3d Cir. 1976); *United States v. Rickey,* 457 F.2d 1027 (3d Cir.) *cert. den. sub nom. Ciotti v. United States,* 409 U.S. 863, 93 S.Ct. 153, 34 L.Ed.2d 110 (1972). The general rule is that defendants who are jointly indicted should be jointly tried. *United States v. Kulp,* 365 F.Supp. 747 (E.D.Pa.1973), *aff'd, Appeal of Powell,* 497 F.2d 922 (3d Cir. 1974); *United States v. Frumento,* 409 F.Supp. 143 (E.D.Pa.1976). The defendant seeking severance bears the burden, and it is heavy, of showing that a joint trial would be prejudicial and unfair. *United States v. Rosa,* 560 F.2d 149 (3d Cir. 1977); *United States v. DeLarosa,* 450 F.2d 1057 (3d Cir. 1971); *cert. den.* 405 U.S. 927, 92 S.Ct. 978, 30 L.Ed.2d 800, 405 U.S. 957, 92 S.Ct. 1188, 31 L.Ed.2d 235 (1972). To meet this burden, the defendant must do more than submit mere allegations or speculations of potential prejudice. He must demonstrate that a joint trial would be so severely prejudicial that it would in effect deny him a fair trial. *United States v. Armocida,* 515 F.2d 29 (3d Cir.), *cert. den. sub nom. Conti v. United States,* 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975); *United States v. Frumento, supra.*

 In deciding a motion for severance, the trial judge must balance a number of considerations. If real prejudice is shown, of course, that factor will figure most prominently in the court's determination. As the potential for actual prejudice declines, however, other important factors increase. In this Circuit, the considerations of judicial economy weigh heavily in any decision on a Rule 14 motion. In *Kulp, supra* at 765, Judge Becker commented: "Interests of convenience, economy and efficient administration of justice dictate that persons joined in the same indictment should be tried together, particularly when proof will be extensive and numerous witnesses must be summoned . . . " This concern also has been enunciated by the Court of Appeals. In *United States v. De-Larosa, supra* at 1064, the court upheld a pretrial denial of severance, saying: "We are mindful that the trial court in the exercise of its discretion must have been aware of the highly relevant considerations of judicial economy and the tactical disadvantage to the government of the disclosure of its case." In *United States v. Rosa,* 560 F.2d at 156 the appellate court sitting *en banc* stated: "Judicial economy militated strongly against severance. The proof offered at a separate trial would have been completely duplicative of the proof in the case *sub judice.*"

The relevance of this factor of judicial economy is increased when a conspiracy count is involved. In *United States v. Segal, supra,* this Circuit's Court of Appeals pointed out "the desirability of joint trials, particularly those with a legitimate conspiracy count . . . " In *United States v. Kenny,* 462 F.2d 1205 (3d Cir.) *cert. den.* 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972), the Court of Appeals sustained a denial of severance in a valid conspiracy case, since the evidence against each co-conspirator was admissible against all.

In the Second Circuit, where many complex criminal actions are tried, the viability of a conspiracy count seems to dictate the difference in ruling on severance motions. In two recent cases, that court of appeals upheld the denial of severance in complex cases. *United States v. Bernstein,* 533 F.2d 755 (2d Cir.), *cert. den.* 429 U.S. 998, 97 S.Ct. 523, 50 L.Ed.2d 608 (1976), involved an eight month trial, with 25,000 pages of transcript. Before submitting the case to the jury, the court reduced the 211-count indictment naming 21 defendants to a 65-count, nine-defendant document. On appeal, it was held that the denial of severance motions was not improper so long as it could be shown that there was only a single conspiracy. In *United States v. Blitz,* 533 F.2d 1329 (2d Cir.), *cert. den.* 429 U.S. 819, 97 S.Ct. 65, 50 L.Ed.2d 79 (1976), a 25-count indictment charged 15 defendants with stock manipulation and mail fraud, a case similar to the one at bar. The case went to the jury with only five defendants. As to those whose conspiracy accusation was submitted to the jury, the court dismissed the severance appeal summarily. A brief discussion of two other complex cases will

illustrate the difference. In *United States v. Branker,* 395 F.2d 881 (2d Cir. 1968), *cert. den. sub nom. Lacey v. United States,* 393 U.S. 1029, 89 S.Ct. 639, 21 L.Ed.2d 573 (1969) *cited with approval, United States v. Armocida, supra,* eight defendants were tried on 81 counts. The trial court dismissed the conspiracy count at the close of the government's evidence, but refused severance motions by four of the defendants, substantially less involved in the remaining counts. The appellate court noted that after dismissal of the conspiracy count, which properly allowed joinder, it became more difficult to keep the charges and the evidence separate as to each defendant.

> "Apart from the prejudice inherent in any mass trial, a defendant in a trial in which the conspiracy count has been dismissed is likely to be prejudiced in defending the charges in the substantive counts by evidence, particularly hearsay testimony, which was admissible on the conspiracy count but which could not have been used against him in a separate trial on the substantive counts." 395 F.2d at 888.

In a case from the Ninth Circuit, *United States v. Donaway,* 447 F.2d 940 (9th Cir. 1971), the trial judge dismissed the conspiracy count during trial. Most of the evidence pertained to events that did not involve the appellant. Of 2300 pages of trial transcript less than 50 dealt with the appellant. On those facts, the appellate court held that it was an abuse of discretion not to grant severance.

In the instant case, this Court finds that the presence of the conspiracy count is a major factor in a denial of the severance motions. The presence of the conspiracy count justifies joinder under Fed.R.Crim.P. 8(b). *United States v. Somers,* 496 F.2d 723 (3d Cir.), *cert. den.* 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974). The conspiracy count minimizes prejudice of otherwise inadmissible evidence that would be envisioned and makes a joint trial highly desirable. Individual trials would require duplication of much of the evidence, in that each trial would involve proof of the same conspiracy.

Furthermore, while considerations of judicial economy militate against severance, defendants at this stage have demonstrated no real prejudice to outweigh this factor. As noted above, the prejudice alleged must be more than speculative or fanciful. Defendants first claim that they are only "peripheral" defendants and would be prejudiced by the disproportionate amount of evidence introduced against their co-defendants. They cite two cases, *United States v. Kelly,* 349 F.2d 720 (2d Cir. 1965), *cert. den.* 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966), *discussed in United States v. DeLarosa, supra,* and *United States v. Mardian,* 178 U.S.App.D.C. 207, 546 F.2d 973 (1976), as support for this proposition. However, an examination of those cases show that a great deal of prejudicial factors, in addition to an imbalance of evidence, caused those appellate courts to reverse the trial court. Both rulings that were overturned by the appellate courts were on motions made during the course of trial, not on pretrial motions. In *Kelly,* defendant Shuck was prejudiced in a number of ways during the course of trial that exacerbated the disproportion of proof: 1) post-conspiracy statements by his two co-defendants which seriously implicated him were erroneously admitted in great volume; 2) a final instruction grouped him together with his co-defendants in an "all-or-nothing" charge as to the conspiracy; 3) his illness and financial troubles resulted in extensive delays in an already-long trial and caused one juror, who was excused, to blame the defendants for the trial's length and perhaps other jurors to resent him. Coupled with the disproportionate evidence both in quality and quantity, the appellate court said the mid-trial motion made after all these events should have been granted. In *Mardian,* one of the Watergate conspiracy cases, Judge J. Skelly Wright noted that the initial severance denial was appropriate. As the trial got underway, it became clear that the bulk of the evidence would focus on a time period after Mardian's active participation had ceased. Furthermore, he was named only in the conspiracy count, unlike the other co-defend-

ants who were also indicted for substantive offenses. Two weeks into trial, an event occurred that "tipped the balance." Mardian's lawyer became ill, and the associate counsel informed the Court that it would be difficult to carry on. The prosecutor admitted that, due to Mardian's peripheral involvement, severance at that stage would cause no undue disruption of trial. Furthermore, it was conceded that a separate trial would be brief. In view of all of those facts, the mid-trial denial of severance was an abuse of discretion.

In the case before this Court, defendants are each charged in all counts of the indictment. The conspiracy count alleges a complex scheme in which each defendant plays an important and perhaps essential role, though varied in size. Each co-defendant appears in the indictment on a number of occasions as participating in the alleged stock manipulation.[2] *See United States v. Corr,* 543 F.2d 1042 (2d Cir. 1976); *United States v. Cohen,* 518 F.2d 727 (2d Cir.), *cert. den.* 423 U.S. 926, 96 S.Ct. 270, 46 L.Ed.2d 252 (1975); (both involving stock manipulation conspiracies). At this stage of trial, the disparity of proof standing alone would not form a sufficient basis from which the Court could infer prejudice. To grant one of these motions on this basis alone would require the court to grant them all, since most of the defendants are not implicated in the full length of the alleged conspiracy. If separate trials were required here, conspiracies such as this one, alleged to involve one or two central defendants whose scheme requires a large number of co-con-

spirators, could never be effectively or efficiently prosecuted.

Defendants also argue that a "spill-over" effect from evidence of co-conspirators' activities will inevitably prejudice their case. The conspiracy count, and the mail fraud counts as a "scheme," allow each act in furtherance of the conspiracy to be imputed to all members. Therefore, joinder is potentially less harmful in this trial than in others. Furthermore, the courts in this Circuit and elsewhere have recognized that this inevitable effect will not, in and of itself, require severance if not extreme and if tempered by proper instructions. In *United States v. Frumento,* 405 F.Supp. 23 (E.D.Pa.1973) Judge Bechtle averred:

> "[W]hile the possibility of 'guilt by association' exists in a joint trial, this does not afford a ground for severance. . . . As the Supreme Court has explained: 'This type of prejudicial joinder is acknowledged to inhere in criminal practice but it is justified on the grounds that (1) the jury is expected to follow instructions in limiting this evidence to its proper function, and (2) the convenience of trying the different crimes against the same persons, and connected crimes against different defendants, in the same trial is a valid governmental interest.' *Spencer v. Texas,* 385 U.S. 554, 562, 87 S.Ct. 648, 17 L.Ed.2d 606 . . . (1967)."

*See also United States v. Kenny,* 462 F.2d at 1218; *United States v. Tallant,* 407 F.Supp. 878 (N.D.Ga.1975), *aff'd* 547 F.2d 1291 (5th Cir. 1977), *cert. den.* 434 U.S. 889, 98 S.Ct. 262, 54 L.Ed.2d 174 (1977).[3]

---

**2.** In the indictment, the moving defendants are specifically mentioned in the following number of paragraphs:' Yiddy Bloom—10 paragraphs, six overt acts; Jerrold Bloom—nine paragraphs and six overt acts; Bernard Cronin-10 paragraphs and four overt acts; Joseph DeLoge-two paragraphs and one overt act; Burton Dubbin-eight paragraphs and five overt acts; Myron Freeman-five paragraphs and three overt acts; Albert London-five paragraphs and three overt acts; Michael Rekoon-five paragraphs and two overt acts; Abraham Salaman-16 paragraphs and seven overt acts; and Robert Street-six paragraphs and three overt acts.

**3.** More specifically, two defendants have alleged that the spillover of "mob overtones" from prejudicial publicity will harm their case. They claim that the articles in newspapers at the time of indictment identifying one defendant as an alleged racketeer will harm their own ability to get a fair trial. The Court feels that any repercussions of this minimal publicity on the impartiality of the venire can be cured by a proper *voir dire.* Certainly, this case has not received sufficient publicity to raise general concerns about a fair trial. Therefore, this specific ground is not seen as a basis of prejudice, since an untainted jury can surely be found. See *United States v. Dioguardi,* 332 F.Supp. 7, 13 (S.D.N.Y.1971).

The Court of Appeals, in *DeLarosa,* 450 F.2d at 1065, has laid down its own test for judging whether "spill-over" has reached a prejudicial point.

> "A defendant is not entitled to a severance merely because the evidence against a co-defendant is more damaging than the evidence against him. . . . While such a disparity in the proof is sufficient in certain cases, the primary consideration is whether the jury can *reasonably be expected to compartmentalize* the evidence as it relates to separate defendants in view of its volume and limited admissibility." (Emphasis added).

*DeLarosa* involved a single event, a bank robbery, and four defendants. The appellate court sustained the denial of severance there. In a later case, *United States v. Somers,* 496 F.2d at 730–731, the Court of Appeals sustained severance denials in a much more complex case. *Somers* was a case brought under the Hobbs Act, 18 U.S.C. § 1951, and the Travel Act, 18 U.S.C. § 1952 and charged conspiracies under both statutes. The 26-count indictment named seven defendants as participants in the two conspiracies. The court held, citing *DeLarosa,* that the jury could reasonably have been expected to "compartmentalize" the evidence. In the case at bar, at this stage, it is apparent to this Court that the jury will be at least as able to segregate the evidence as in *Somers.* Therefore, under the "compartmentalizing" test, no severance is needed. *See also United States v. Dansker,* 537 F.2d 40 (3d Cir. 1976) (Where evidence clearly related only to certain of the seven defendants in conspiracy trial, no severance was required); *United States v. Kenny, supra* ("Mere possibility" that some evidence under 34-count conspiracy and extortion indictment might be inadmissible against some of six defendants "is not in itself a sufficient reason for multiple trials growing out of a closely related set of transactions."); *United States v. Cohen, supra* (Careful judicial instructions allowed jury to compartmentalize proof in 42-count stock manipulation trial).

 Some of the defendants have raised more specific complaints about problems of a joint trial. A number of them have complained that they will be unable to call a co-defendant in their own defense. In this Circuit, a defendant may not be compelled to testify even if he is tried separately from his co-defendants *United States v. Somers, supra; United States v. Barber,* 442 F.2d 517 (3d Cir. 1971) *cert. den.* 404 U.S. 958, 92 S.Ct. 327, 30 L.Ed.2d 275 (1971). Therefore, in order to show prejudice flowing from a joint trial, the movant must show that his co-defendant would voluntarily testify and that such testimony would be exculpatory. This is a burden of affirmative proof, not mere allegations or possibilities, requiring a presentation of specific facts on the nature and importance of such testimony. *United States v. Stitt,* 380 F.Supp. 1172, 1176 (W.D.Pa.1974), *aff'd* 510 F.2d 971 (3d Cir.), *cert. den.* 421 U.S. 962, 95 S.Ct. 1949, 44 L.Ed.2d 448 (1975). *United States v. Frumento,* 409 F.Supp. at 144–146. In an *en banc* decision, *United States v. Rosa, supra,* the Court of Appeals outlined five areas of inquiry for the district court on a motion to sever so that a co-defendant may testify. First, the Court is to judge the bona fides of the movant's intent to have a co-defendant testify. Here, finding these motions unsupported by anything but the barest allegations, the Court is somewhat skeptical as to the seriousness of their desire to call a co-defendant. Second, the Court is to judge the nature, function and significance of the proposed testimony. Since no defendant has supplied any outline of the proposed testimony at all, the Court cannot judge this factor. Third, the trial judge must be satisfied as to the likelihood that the co-defendant would in fact testify. In *Rosa,* the full Court of Appeals noted that the proposed "witness" never gave any assurances that, if severed, he would testify. His silent "assent" in the face of the movant's statements was not sufficient. The fourth factor, judicial economy, has already been analyzed above as being impaired by severance in this case. Finally, the possibility of surprise or cross-defendant prejudice as a result of last-minute guilty pleas is also a factor. The Court

does not see that this case is any more or less likely to result in prejudice from such possible negotiated pleas. Based on this evaluation of the record put forth by the defendants, the Court will not sever because of a desire to have a co-defendant testify.

■ Defendants also seek severance because a joint trial would not allow them to comment on a co-defendant's silence. Again, in this Circuit, a defendant must show real prejudice stemming from such a situation. *United States v. Addonizio*, 451 F.2d 49 (3d Cir.), *cert. den.* 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972). The Court of Appeals has ruled that the inability to comment is significantly prejudicial only when defenses are mutually exclusive, that is, where the acceptance of one defense requires rejection of another. *United States v. Somers, supra.* Possible prejudice is not enough: there must be an affirmative showing as to the exclusivity of the defenses. *United States v. Frumento*, 405 F.Supp. at 31.

■ Here, only two defendants claim that their defenses will be exclusive. Defendant Salaman alleges that his defense will be inconsistent. However, since he does not in any way explain what his defense will be or how it will exclude any other defense, the Court is unable to ascertain any real prejudice. Defendant Dubbin contends that his defense of having been victimized—that he was duped into illegal activity by others—is inconsistent with other defenses. The Court does not see how such an argument would exclude other defenses, since it appears that all defendants will be claiming that their activities were innocent and within the bounds of the law. Dubbin's defense would be consistent with that approach. If Dubbin attempts to shift the onus onto a co-defendant by claiming that such party led him into illegal activity, that co-defendant need not impeach Dubbin to escape guilt. He need only show that his conduct was equally innocent. In this way, the Court does not see that Dubbin's defense is mutually exclusive. Therefore, the inability to comment on silence is not prejudicial.

■ Finally, defendants have argued that use of co-conspirators' statements by the prosecutor will work an irreparable harm on them at trial. The Court is well aware of the lessons of *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and expects the government to be similarly cognizant. In its brief, the government has assured the Court that use of out-of-court statements will be kept to a minimum and that any so used will be properly redacted of references to co-defendants. The Court will require submission of any statements to be presented prior to their use for any purpose at trial. This should cure any *Bruton* problems before they arise.

This Court, in the exercise of its sound discretion under Rule 14, has chosen to deny all severance motions at this time. However, the Court is fully aware of the mandate from the Court of Appeals as to the reconsideration of these motions at appropriate times. In *DeLarosa, supra* at 1064, the appellate court said: "Since not all the asserted grounds for severance [can] be anticipated or advanced at the outset of trial, it [is] essential that the trial court balance all factors and potential prejudice at the stage that each such motion [is] made." This means, of course, that the burden still lies on the defendant to make the appropriate motion and showing at the proper time, for the Court is not required to sever *sua sponte. United States v. Archie,* 452 F.2d 897 (3d Cir. 1971), *cert. den.* 405 U.S. 1071, 92 S.Ct. 1521, 31 L.Ed.2d 804 (1972). If, at any time, defendants wish to raise new reasons, to put forward new facts or to point out changed circumstances to the Court that would justify altering this ruling, the Court certainly will consider them. However, on the basis of the record as it now stands, the Court sees no real prejudice that would require severance under this tightly presented conspiracy indictment. Therefore, the motions to sever must be denied.

### MEMORANDUM AND ORDER ON MOTION FOR PRODUCTION

Defendants Jerrold Bloom, Abraham Salaman, Bernard Cronin, Robert Street, Jo-

seph DeLoge, Burton Dubbin and Albert London have moved this Court for production of certain materials under Fed.R.Crim.P. 16 and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The Court has considered these motions and will explain its rulings and the time table it will set up in the opinion below.

▮ Defendants have made numerous claims under *Brady* for certain material which they claim is or may be exculpatory. *Brady* is not a discovery rule, but is a constitutional mandate designed to provide due process for criminal defendants. *United States v. Kaplan,* 554 F.2d 577 (3d Cir. 1977). *Brady* held that:

> "Suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good or bad faith of the prosecutor." 373 U.S. at 87, 83 S.Ct. at 1197.

That decision has been somewhat modified by later Supreme Court rulings, the most recent of which is *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). In *Agurs,* the Supreme Court tailored its definition of materiality to vary, depending on the facts. Here, where the court does not have any basis to believe that the prosecutor is intentionally or innocently withholding information, the court must consider as *Brady* material only evidence that if presented at trial would create a reasonable doubt that would not otherwise exist. Therefore, although difficult at this pretrial stage, the court will attempt to evaluate the importance as well as the function of each piece of information sought by the defense. It will order that the prosecutor must turn over information which it feels may have a significant effect on the ability of the defendants to prepare their defense for trial. This will include evidence exculpatory as to the material charges of the indictment, as well as evidence which may have a significant impeachment value. Since *Brady* does not require a prosecutor to turn over his entire file, those documents which cannot be reached under *Brady* may

be considered only under the discovery procedures of Rule 16.

Defendants first seek a copy of each prospective government witness' criminal record. A number of district courts have allowed discovery of such material, as it may have significant impeachment value. *United States v. Leta,* 60 F.R.D: 127 (M.D.Pa. 1973); *United States v. Ahmad,* 53 F.R.D. 186 (M.D.Pa.1971). The government has agreed to turn over the criminal records. Since the use of these records will be for impeachment purposes during cross-examination, many courts have ordered that the records do not need to be produced prior to cross-examination. *United States v. Frumento,* 405 F.Supp. 23 (E.D.Pa.1976); *United States v. Quinn,* 364 F.Supp. 432 (N.D. Ga.1973). In this case, the government has already voluntarily consented to accelerating its release of materials covered by the Jencks Act, 18 U.S.C. § 3500. Therefore, the Court believes it is in the best interest of efficiency and judicial economy to order the government to turn over the criminal records of those witnesses as to whom Jencks material has already been supplied forthwith. The criminal records of those witnesses whose Jencks material will be supplied at the statutory time can be submitted at the time of cross-examination.

▮ Defendants also request the details of any negotiated pleas, promises of favorable treatment or other "deals" made by the prosecutor or other government agent. As to many of the witnesses who will be called at trial, including the unindicted co-conspirators, the Court feels that this information could have significant impeachment value. Although a full evaluation of the impact of any such evidence may be facilitated by waiting until the time of trial, the Court believes that this pretrial stage is an appropriate time for revelation of all such negotiations. The Third Circuit, in *United States v. McCrane,* 547 F.2d 204 (3d Cir. 1976), and *United States v. Harris,* 498 F.2d 1164 (3d Cir. 1974), has recognized the impact that any inference of prosecutorial favoritism may have on a jury's evaluation of a witness' credibility. The investigation

surrounding this indictment has been long and complicated, involving perhaps many different levels of negotiations and promises with many different witnesses. The prosecutor has acknowledged his responsibility to reveal the details of any negotiated plea, and cites the defendants to pleas which have been entered in as of record in this Court. These records are available in the public domain and need not to be produced by the government. However, in view of the teachings of *Harris, McCrane,* and other relevant decisions both in this Circuit and others, the Court would caution the prosecutor that he has an affirmative duty to reveal any informal arrangements or promises of leniency, assistance in proceedings before other agencies or courts, or any other inducement which was offered by his office in order to obtain the witness' cooperation. If any of these informal agreements or offers in fact do exist, the Court orders the prosecutor to make this information known, promptly and as soon as he becomes aware of it.

 Defendants have also requested that they be informed of any parallel investigations which may involve witnesses to testify on behalf of the government. The Court is presently of the opinion that such parallel investigations, which have not reached fruition, and which do not involve any promises or inducement by the prosecutor, are not relevant for trial. Since they have not resulted in a conviction or administrative finding of wrongdoing, it appears to the court that the existence of the investigation itself would not be admissible at trial, even for impeachment use. Especially as to any investigations which might presently be in front of a grand jury, which is traditionally cloaked with secrecy, the Court does not see any reason for defendants to have this information. Except for those "deals" that were discussed above, the Court therefore denies defendants' request for information as to parallel investigations.

Defendants have generally requested impeaching material or other material favorable to the defense. As noted in *Agurs,* these far-reaching requests cannot create in the defendants as significant a right as would a more specific request. In the instant case, the government has made available for inspection and copying all of the documentary and tangible evidence it has collected and a substantial portion of the Jencks Act material. Defendants claim that merely making this material available for their inspection does not satisfy *Brady,* since they will have to make their own evaluation as to what is exculpatory and what is not. The Court is somewhat surprised at this argument by defendants, for many defendants would welcome the right to make their own evaluation as to the importance of the government's evidence. Here, because it is of an extensive volume, the defendants would prefer to have the government placed in a position where it must reexamine each document as to its *Brady* significance or suffer the penalty of a conviction reversal if they have overlooked any documents. In *United States v. Hildebrand,* 506 F.2d 406 (5th Cir.), *cert. den.* 421 U.S. 968, 95 S.Ct. 1961, 44 L.Ed.2d 457 (1975), that court held that when the United States attorney had disclosed all documentary evidence in a mail fraud case one week prior to trial, there was no failure to comply with *Brady.* Other cases have similarly held that a revelation of the prosecutor's file eliminates any *Brady* complaints. *United States v. Quinn,* 349 F.Supp. 232 (E.D.Wis.1972), *aff'd* 481 F.2d 1406 (7th Cir. 1973). In *United States v. Leta, supra,* Judge Muir advocated the opening of the government's file for defenses inspection as the surest way to locate *Brady* material. Although the government in this case has not consented to turning over all of its papers, but only its documentary evidence, *Brady* requests for material not presently available are still in order. It would seem to the Court that as regards the documents already produced, the government has fulfilled its *Brady* obligation. However, the Court would ask and the government has already consented, that the prosecutor should make available any exculpatory or impeaching evidence that may be revealed as it reviews these documents in preparation for trial. Such identification of

*Brady* material should be made to the defendants as soon as it becomes apparent to the prosecutor, and he should not wait until trial to do so.

■ Defendants have also requested that the government turn over the statements of all co-defendants. The government has already complied with the requirement of Rule 16(a), and has made available to each defendant copies of his own statements. The government has responded to this request by citing *United States v. Ahmad, supra,* which denied a similar request for co-defendants' statements, stating that if they desired them, they could exchange among themselves. While this would be one way of accomplishing this, the Court sees nothing in the Rules that prohibits requiring the government to produce co-defendants' statements provided that such co-defendants are not testifying at trial. In *United States v. Percevault,* 490 F.2d 126 (2d Cir. 1974), that Court of Appeals reversed a district judge's order requiring the government to turn over all statements of co-defendants who were to be testifying at trial. The lower court had originally ordered production of all co-defendants' statements, including those that were not to testify, and the government had agreed to comply with all of the order except as to testifying co-defendants. The Court of Appeals for the Second Circuit held that a district court cannot order production of co-defendants' statements if they are covered by the Jencks Act. A similar conclusion was also drawn by the Seventh Circuit Court of Appeals in *United States v. McMillen,* 489 F.2d 229 (7th Cir. 1972). The *Percevault* Court of Appeals did not disturb the lower court's order to produce the statements of co-conspirators and co-defendants who would not be testifying at trial. Since these defendants' statements would not be covered by the Jencks Act, their statements could be produced. *Accord United States v. Fine,* 413 F.Supp. 740 (W.D.Wis.1976). Courts have felt a need for disclosure of co-defendants' statements under a conspiracy indictment, where Fed.R.Ev. 801(d)(2)(E) exempts the statements of co-conspirators from the hearsay rule. In ad-

dition, in this indictment both under count 1 and under 4 through 31, the acts of co-defendants may bind any participant in the alleged scheme. In *United States v. Agnello,* 367 F.Supp. 444 (E.D.N.Y.1973), that court ordered production of any co-defendants' statements which the government intended to introduce as a "co-conspirator's declaration." Finally, in an integrated conspiracy situation such as the case at bar, where defendants may in fact be able to exculpate each other, the production of co-defendants' statements seems to comport with *Brady.* However, some defendants may object to revelation of their statements to co-defendants. Therefore, after weighing the arguments on both sides, the Court has decided to order production of all co-defendants' statements for inspection and copying, unless it appears that such co-defendants will be testifying at trial. If the co-defendants' statements are thus covered by the Jencks Act, the Court will leave such production to the discretion of the government. Any production by the government, however, is not to occur for ten (10) days. During that time, any defendant may file with the Court his objection to revelation of his statements to his co-defendants.

■ Defendant Jerrold Bloom has requested that the court order production of any of his own "statements" that may be contained in transcript or memos of third parties' statements to government agents. Most courts have held, when revelation of third parties' statements would violate the Jencks Act, that a district court cannot enter such an order. Since much of the Jencks Act material is presently available, defendant Bloom already may have access to some of these statements. If they are contained in the remaining Jencks Act material, he will be provided with them at the time of cross-examination. If they are not contained in Jencks Act material, and are exculpatory, then they must be produced under *Brady.* If they are neither exculpatory nor covered by the Jencks Act, with the minimal showing of materiality made by defendant Bloom as required by Rule 16, the Court sees no reason to order their

production. This is especially true in light of other courts' decisions not to order production of similar statements. *United States v. Walk,* 533 F.2d 417, 418 (9th Cir. 1975), held "the connection between the defendant and the written statements is too attenuated for the statements to be considered written statements made by the defendant [and available for inspection under Rule 16(a)(1)]." In *United States v. Dorfman,* 53 F.R.D. 477 (S.D.N.Y.1971) *aff'd* 470 F.2d 246 (2nd Cir. 1972), that court noted that oral statements made to a third party can be admitted only through that person's actual testimony. Therefore, since the. written statement containing hearsay would not be admissible at trial, this Court finds that there is no substantial need shown to meet the requirements of Rule 16. Defendant Bloom, therefore, will not be entitled to discovery of any statements not obtainable under the Jencks Act or under *Brady.*

■ Defendants have also requested a list of witnesses who will testify at trial. In *United States v. Mitchell,* 540 F.2d 1163 (3d Cir. 1976), the Court of Appeals held that discovery rules do not permit the defense to get the names of witnesses. This opinion has been echoed by many courts in this district, including this one. *United States v. McCullough,* Cr. No. 76–413, 427 F.Supp. 246 (E.D.Pa.1977); *United States v. Hutchins,* 53 F.R.D. 455 (E.D.Pa.1971). Therefore, the Court will not order the government to make available a general list of witnesses. Many of the witnesses' identities may be ascertained by examining the Jencks material which has already been provided for defendants' inspection. Defendant Salaman particularly has requested a list of witnesses who might testify favorably on his behalf. Courts have split in allowing discovery of this material, allowing it under *Brady* or disallowing it as too general. In *United States v. Quinn, supra,* a defendant requested the names and addresses of persons "with knowledge of the facts of this case." That district court said "while such information might be generally 'helpful' in the same way that copies of all documents in the government's file pertain-

ing to the case might be helpful, the court finds that the decision in *Brady* was not meant to bring the parameters of criminal and civil discovery into congruence, as desirable as such a reform might be." 364 F.Supp. at 442. However, in *United States v. Gonzalez,* 466 F.2d 1286 (5th Cir. 1972), the Court of Appeals for the Fifth Circuit refused to overturn a conviction when the government had failed to name a witness who might be exculpatory. The court said that a general request for "names and addresses of all persons having knowledge pertaining to the facts," did not create a duty on the prosecutor to provide this particular name. "In effect the appellant was asking the government to simplify his task of evidence-gathering. No prejudice to the appellant resulted from the government's refusal to join this fishing expedition." 466 F.2d at 1288. In *United States v. Addonizio,* 451 F.2d 49 (3d Cir.) *cert. den.* 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972), the Court of Appeals held that the government need not·turn over a witness list. However, the court noted, if a legitimate request is made that would have the effect of revealing the government's list of witnesses, it cannot be denied because it would have that effect. This Court has decided that under all the circumstances, including the substantial revelation of Jencks material and documents, a wholesale witness list will not be required. However, if the government now knows of any witnesses who it will not be calling who may have exculpatory material, under the provisions of *Brady,* the government must reveal this information at a time adequate to allow the defense to prepare for trial. The government is entitled to use its discretion in making this decision, but it is cautioned that it will be held to the standards enunciated in *Brady,* its progeny, and the decisions governing this area in the Third Circuit.

■ Defendants Jerrold Bloom and Abraham Salaman have requested that the Court order production of the criminal reference report or other documents of transmittal from the Securities and Exchange Commission (SEC) to the Department of

Justice. The Court has decided that these are documents which are privileged under Rule 16(b) as internal government memoranda. The Court believes that this is consistent with a number of decisions which have dealt with other civil agencies' documents. In *United States v. Krilich,* 470 F.2d 341 (7th Cir.) *cert. den.* 411 U.S. 938, 93 S.Ct. 1897, 36 L.Ed.2d 399 (1972) and *United States v. Wahlin,* 384 F.Supp. 43 (W.D.Wis.1974), the courts held that. the Internal Revenue Service special agent's final report of his investigation was not discoverable. In *United States v. Kessler,* 61 F.R.D. 11 (D.Minn.1973), that court held that the reports of the Federal Deposit Insurance Corporation were also covered by Rule 16(b). Therefore, the statements made to an FDIC investigator need not be revealed until trial. Furthermore, defendant Bloom has not made any showing of materiality sufficient to require disclosure of these materials under Rule 16(b). Defendant Bloom also requests disclosure of briefs filed with the SEC, the so-called "Wells Committee Papers." The Court sees no bases on which to grant this request. Similarly, the Court does not feel that the reports of quasi-official agencies, such as the New York Stock Exchange, the American Stock Exchange and the National Stock Exchange, are susceptible to discovery without a showing of materiality. The defendant has failed to show that there is any alternative means by which he could obtain the documents. He has requested books, documents and other tangible objects obtained by the SEC presently in the possession of the government. The Court assumes, and it will rely on the government to correct it if in error, that these objects are presently among those available for inspection at the prosecutor's office. Therefore, this request of Jerrold Bloom will be denied.

Finally, with regard to the prior SEC proceedings, defendant Bloom has requested the transcripts or statements of witnesses before the SEC made by persons who will not be witnesses at trial. This Court holds, as it did with regard to other statements, that if exculpatory, the defendant is entitled to receive these documents under *Brady.* The government therefore should review its files on this subject specifically to determine if any of these documents are in fact under the *Brady* doctrine. The request of Jerrold Bloom for results of any civil or administrative actions, which he admits are in the public domain, shall be denied.

A number of defendants have requested that all grand jury transcripts be made available for their inspection. However, as required under Rule 6(e) of the Federal Rules of Criminal Procedure, no showing of particularized need has been made. Because the grand jury transcripts are traditionally protected from discovery without a showing of need or an allegation that a motion to dismiss the indictment for improprieties will be made, discovery is not loosely granted. *United States v. Michael Lee,* Cr. No. 77–257 (E.D.Pa. Sept. 14, 1977). The decision to reveal grand jury transcripts is committed to the discretion of the trial judge, *United States v. Byrne,* 422 F.Supp. 147 (E.D.Pa.1976), *aff'd in part* and *rev'd in part,* 560 F.2d 601 (3d Cir. 1977). To the extent that such transcripts are controlled by the Jencks Act, the Court may not order disclosure of them prior to the statutory timetable. However, it is to be noted that many of these transcripts are presently available for inspection by counsel. In *United States v. Budzanoski,* 462 F.2d 443 (3d Cir.) *cert. den.* 409 U.S. 949, 93 S.Ct. 271, 34 L.Ed.2d 220 (1972) the Court of Appeals held that pretrial discovery of grand jury testimony was governed exclusively by the provisions of Rule 6(e). In absence of any showing of particularized need under that rule, and unless covered by *Brady, United States v. Leta, supra,* the Court does not feel that discovery would be appropriate. Finally, defendants Salaman has made a number of requests regarding the length, number and other details of the grand jury. Again, without having met the requirements of Rule 6(e), the Court does not feel discovery of this information is proper. "Mere speculation that . . . . improprieties may have occurred will not suffice to support the required showing." 462 F.2d at 454.

Defendants Cronin and Street have filed requests for discovery of informants and sham defendants. The government has denied that any of these persons exist in this case. Therefore, the defendants' motion will be denied.

Defendants have also asked for revelation of a list of expert witnesses with a summary of their opinions. Defendants London and Dubbin have asked for only those experts which will appear at trial, while Jerrold Bloom has requested information on those which will not testify at trial. The government has consented to turn over the name and address of any expert witness that they intend to call at trial, and will reveal any reports such expert has prepared. In an effort to prevent unnecessary surprise and the resultant delay at trial, the Court will ask the government to supply a brief summary of each expert's testimony, not to exceed one page, for use in defense counsel's preparation, as well as the Court's guidance at trial. The Court does not intend that these summaries will be scripts of the expert's testimony and will not consider them to be conclusive upon the government at the time of trial.

Defendants have further requested that the charts and summaries which the government intends to introduce at trial be turned over to them forthwith. The government has promised to produce them when they are prepared. Again, in the interests of expediting trial and preventing unnecessary and involved challenges to such charts and studies, the Court will order the government to produce such summaries at least ten (10) days prior to their use at trial. However, as they become available, the Court requests the government to produce them even if earlier than required.

Finally, Joseph DeLoge has requested a number of statements, memos, or stenographic transcripts, which he believes to be covered by *Brady*. The generalized requests are somewhat difficult for the Court to rule on in any meaningful way. The government is required, as mentioned previously, to turn over all exculpatory material under *Brady*. The Court notes that transcripts for three of the four persons specifically mentioned by DeLoge are already available for his inspection. The government should examine the fourth individual's testimony to determine if there is any *Brady* material in it. In all other respects, the motion of DeLoge is denied.

## ORDER

AND NOW, to wit, this 19th day of December, 1977, it is hereby Ordered that:

1. As it reviews in preparation for trial those documents already available for inspection, the government is to notify counsel of any exculpatory material it locates.

2. The government is to produce the details of any formal or informal plea bargain, promise of leniency or promise of assistance, or any other offer made by a government agent, to any person who will testify in this trial, whether directly or indirectly related to this indictment.

3. The government is to produce for inspection and copying forthwith the criminal records of those persons whose statements have been made available prior to trial, and to produce at the time of testifying any criminal records for witnesses that have not yet been produced.

4. Ten (10) days from this order, the government is to make available for inspection and copying all statements of defendants, unless a defendant has filed an objection with the Court to the production of his statement.

5. The government is to review all information in its file not yet produced, to see if it must be produced under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Such review should include, among other things, the statements of all persons interviewed who are not testifying at trial, and a list of any possible exculpatory witnesses and their statements should be made available to defendants forthwith. All *Brady* material should be made known and available to defendants as soon as it is identified.

6. The government is to prepare a list of expert witnesses and a short summary of

**622**

their opinions. Also, the government is to turn over any expert reports which it may obtain. This information is to be turned over no later than ten (10) days before their testimony at trial, unless good cause is shown. Furthermore, all charts and summaries are to be turned over no later than ten (10) days prior to their use at trial, unless good cause is shown.

7. All other portions of defendants' discovery motions are hereby DENIED.

AND IT IS SO ORDERED.